**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| SAFETY SOCKET LLC, a Delaware limited liability company, | ) ) ) | |
| *Plaintiff*, | ) ) | Case No. 18 CV- |
| v. | ) ) | Judge |
| RELLI TECHNOLOGY, INC., a Florida corporation, | ) ) ) | |
| *Defendant.* | ) ) | |

**COMPLAINT FOR INJUNCTIVE AND MONETARY RELIEF**

Plaintiff, Safety Socket LLC, (herein "Safety Socket" or "Plaintiff"), as and for its Complaint against Defendant, Relli Technology, Inc., (herein "Relli" or "Defendant"), alleges as follows:

## I. NATURE OF THE ACTION

1. This is an action for trademark infringement, unfair competition and false designation of origin under the Trademark Act of 1946, as amended, 15 U.S.C. §§1051, *et seq.,* and for trademark infringement, unfair competition and deceptive trade practices under the laws of the State of Illinois, including the Uniform Deceptive Trade Practices Act, 815 ILCS 510/1, *et seq.*

2. The case arises from Relli's unauthorized, unlawful and potentially injurious use in commerce of Safety Socket's standard commercial-grade socket screws (a/k/a "fasteners") and associated trademarks. Virtually all of the fasteners that Relli sells are utilized either in heavy equipment, tanks and other assets of the U.S. Armed Forces, or in commercial airplanes and other

applications in the aerospace industry. Fasteners used in military or aerospace applications must comply with published military or aerospace standards and specifications for strength, durability and other critical attributes pertaining to the particular fastener at issue.

3.     On two occasions of which Safety Socket is aware, Relli purchased standard commercial-grade socket-head fasteners manufactured by Safety Socket and had them shipped to electroplating facilities for coating and other processing. Relli then, in one instance, sold, and in the other instance, at a minimum, intended to sell the coated and otherwise altered *commercial-grade* Safety Socket fasteners in fulfillment of one or more of its customers' orders for *military-grade* fasteners. Relli's purchase and sale of standard commercial-grade fasteners to fill orders for military-grade fasteners is sometimes known in the fastener industry as "up-certing."[1]

4.     A seller engaged in up-certing either masks non-compliance or purports to have increased the compliance level of particular commercial-grade fasteners, typically through some type of plating, coating or other processing, supposedly bringing them into compliance with the military or aerospace standards and specifications established for the particular fasteners ordered by the customer.

5.     Up-certing as practiced by Relli is unlawful and potentially injurious to persons and property, because it involves: (a) material misrepresentations of

_____

[1]"Certing" is a shortening of "certifying," so that "up-certing" signifies the false upgrading of a fastener's certification from commercial to military or aerospace-grade.

2

the nature and quality of Safety Socket's commercial-grade fasteners, overstating their fitness for the greater performance demands and stressors typically encountered in military and aerospace applications; (b) altering the appearance and/or physical characteristics of Safety Socket's fasteners and then, upon information and belief, distributing them with Safety Socket's trademark markings and Safety Socket's manufacturing certification, which also bears Safety Socket's trademarks; (c) misrepresenting these altered standard commercial fasteners as goods sourced or originating from Safety Socket; (d) on information and belief, using fraudulent, deceptive or misleading certifications of compliance, which bear Safety Socket's trademarks, in order to sell the altered standard commercial fasteners as military or aerospace-compliant fasteners; and (e) engaging in the foregoing activities without the knowledge, authorization or supervision of Safety Socket, as the fasteners' manufacturer and trademark owner.[2]

## II. PARTIES

6.      Plaintiff, Safety Socket LLC, is a Delaware limited liability company, duly authorized, registered and doing business in Illinois with its principal

---

[2] At least one federal judge has recognized up-certing as unlawful, ruling that an aerospace parts distributor who up-certed Safety Socket's commercial fasteners, by coating them and selling them in fulfillment of an order for aerospace-grade fasteners, constitutes trademark infringement, unfair competition and false designation of origin under 15 U.S.C. §1125(a), as well as trademark infringement, unfair competition and deceptive trade practices under the laws of the State of Illinois, including the Uniform Deceptive Trade Practices Act, 815 ILCS 510/1, et seq. *See Safety Socket LLC v. Accurate Aerospace, Inc.*, Case No. 1:15-cv-02437 (N.D. Ill., May 26, 2016), Order and Judgment of Injunctive Relief, Hon. Virginia M. Kendall, U.S.D.J. (ECF Document #50).

location at 49 Prairie Parkway, Gilberts, Illinois, 60136. Safety Socket is primarily engaged in the business of manufacturing commercial, aerospace and military-grade fasteners for its federal government, military, aerospace and commercial customers. Safety Socket's fasteners are currently in use in propellers, nuclear reactors, military battle tanks, naval guns, heavy earth-moving equipment, roller coasters and recreational vehicles, which are sold and utilized throughout the world.

7. Defendant, Relli Technology, Inc., is a New York corporation, with its principal place of business at 1200 S. Rogers Circle, Boca Raton, Florida, 33487. According to its website (www.relli.com),

> [Relli] is an American company and a major international manufacturer and supplier of military/defense and aerospace parts, components, equipment and total systems since 1975. . . . [Relli's] products are used as components by OEMs and used as spare parts for maintenance, repairs, overhauls and refits by governments, defense contractors, and supplied to Army, Navy, Air Force, and Marine end-users in the United States and 28 countries worldwide.

### III. JURISDICTION AND VENUE

8. This Court has personal jurisdiction over Defendant because, (i) Defendant intentionally sought out, and contracted with and/or did business with, at least two companies doing business in Illinois, as part of its conduct that forms the basis for Plaintiff's claims in this lawsuit, (ii) upon information and belief, Defendant has engaged in continuous business activities in, and directed to, the State of Illinois and within this judicial district and (iii) Defendant has knowingly and intentionally committed tortious acts aimed at, and causing

harm within, the State of Illinois and this judicial district, from which the causes of action set forth herein arise.

9.     This Court has jurisdiction over the subject matter of this action pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331, 1332(a)(1), 1338 and 1367, because (i) Plaintiff's claims are based on violations of, among other laws, the Lanham Act, as amended, 15 U.S.C. §§ 1051-1127 and (ii) Plaintiff and all of its individual members, on the one hand, and Defendant, on the other, are citizens of different states, and the amount in controversy exceeds $75,000 exclusive of interest and costs.

10.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b) and (c) because Defendant transacts business in this district and because events giving rise to the claims asserted herein have occurred within this judicial district.     Additionally, the damage to Plaintiff and its intellectual property described herein occurs in this judicial district.

## IV. **FACTS COMMON TO ALL COUNTS**

### A. **Plaintiff's Business and Trademarks**

11.     Safety Socket is primarily engaged in the business of manufacturing commercial and aerospace-grade fasteners for its federal government, military, aerospace and commercial customers.  Safety Socket's fasteners are currently in use in, among other things, propellers, nuclear reactors, military battle tanks, naval guns, heavy earth-moving equipment, roller coasters and recreational vehicles, which are sold and utilized throughout the world.

12.     Since its founding in 1931 as Safety Socket Screw Corporation,

5

Safety Socket has developed and maintained a reputation for consistently manufacturing fasteners of quality and performance that exceeds the applicable requirements in high-strength, critical applications. Safety Socket's technical staff employs protocols that subject their fasteners to mechanical and performance tests beyond their installation requirements in both commercial and aerospace or military contexts.

13. Based on its reputation for reliability and quality, Safety Socket has become an approved commercial supplier for, among others, Siemens Energy & Automation, Polaris, Caterpillar, Harley Davidson, GE- Locomotive, GE- Medical Systems, Disney World, Bendix, Toro, Komatsu, Cummins Engine, General Motors, Ford Motor Co., Chrysler and Solar Turbines. In addition, Safety Socket is an approved aerospace/military supplier for, among others, Hamilton Sundstrand, Rolls Royce, Lockheed Martin, Hartzell Propeller, BAE Systems, General Dynamics, MOOG, Woodward Governor, Bombardier, Newport News, Defense Logistics Agency, Sikorsky, Rafael and United Technologies.

14. Safety Socket is included in the "Department of Defense Handbook Listing of Fastener Manufacturer's Identification Symbols," also known as "MIL-HDBK-57F." This listing serves as verification to the military and aerospace industry that Safety Socket is an approved manufacturer of, among other things, military and aerospace-grade fasteners.

15. Pertinent here, Safety Socket owns and uses the following trademarks: (a) banded-knurl screw cap (the "Banded Knurl Mark"), in exclusive and continuous use since 1960, PTO Reapplication Ser. No. 86323543; (b)

6

SAFETY SOCKET (name and word mark), in exclusive and continuous use since 1931; and (c) SAFETY SOCKET and Design, in exclusive and continuous use since 2004, (collectively, the "Safety Socket Marks").  Safety Socket also owns a stylized SAF mark, Registration No. 3953697 (the "SAF Mark"), which is included in MIL-HDBK-57F and has been used exclusively and continuously by Safety Socket since 2010 on its military and aerospace-grade fasteners.

**B.  Defendant's Business**

16.  According to its website, Relli is licensed by the U.S. Department of State, U.S. Department of Commerce and the Bureau of Alcohol, Tobacco, Firearms and Explosives for exporting, importing and brokering military-compliant parts.

17.  In addition, according to its website,

> [Relli has] 30 + years in business supplying military parts.  All employees have technical background and knowledge.  [Relli has] 500 years of combined managerial, technical and engineering experience.  Our management and technical staff's [sic] has a background with companies such as: Pratt & Whitney, United Defense, Allied Signal, Rolls Royce, IBM, Hamilton, Standard, Harris Corp., U.S. Government, U.S. Department of Defense, ABB (Asea Brown Boveri), BAE, Reliance Electric, Aerospace Coatings, General Electric, Point Blank, Body Armor, Grossman's Distribution, U.S. Air Force, Lockheed Martin (formerly Martin Marietta).

**C.  Defendant's Unlawful Uses of Plaintiff's Goods and Trademarks**

18.  Safety Socket has been selling military and aerospace-grade fasteners to Relli for several years.

19.  As a supplier of parts, often for critical applications in these two

highly regulated sectors, Relli is aware of the specifications, standards and regulations applicable to the military and aerospace-grade fasteners it sells.

20.     As a seller of processed standard commercial-grade fasteners to fill orders for military-grade fasteners, Relli, upon information and belief, is also aware of the qualitative differences between commercial and military-grade fasteners.

> **1.     Relli Purchases 5,000 Safety Socket Standard Commercial Socket Head Cap Screws and Has Them Plated Without Safety Socket's Knowledge or Authorization.**

21.     Safety Socket sells its standard commercial-grade fasteners through its commercial distributor, Kanebridge Corporation ("Kanebridge").

22.     On or about January 8, 2010, Relli purchased 5,000 Safety Socket 3/8-16 x 1-3/4 commercial standard socket head cap screws (the "SSLLC 3/8 Commercial Fasteners") and had them plated by Electronic Plating Company, Inc., of Cicero, Illinois ("Electronic Plating").  The SSLLC 3/8 Commercial Fasteners were manufactured by Safety Socket solely for commercial (*i.e.*, not aerospace or military) applications.

23.     Relli purchased all 5,000 SSLLC 3/8 Commercial Fasteners from Kanebridge's Elgin, Illinois location.

24.     Relli also received Safety Socket's certification (the "Safety Socket Certification") for its 5,000 "Lot Number I015E-0000" of Safety Socket 3/8-16 x 1 3/4 standard commercial socket head cap screws.  This certification is for standard commercial fasteners and does not cover military or aerospace parts.

25.     The Safety Socket Certification includes two of the Safety Socket

8

Marks: SAFETY SOCKET (name and word mark) and SAFETY SOCKET and Design.

26.    On or about January 8, 2010, Kanebridge, at Relli's direction, shipped all of the 5,000 SSLLC Commercial Fasteners to Electronic Plating for plating and/or other processing.

27.    Relli never advised or sought authorization from Safety Socket concerning the plating or other processing of the SSLLC Commercial Fasteners by Electronic Plating or by any other entity.

28.    As established in e-mail communications in April of 2018, between Relli and Safety Socket personnel, Relli sought to sell some or all of the now-altered SSLLC 3/8 Commercial Fasteners (the "Altered SSLLC Commercial Fasteners") as military-grade fasteners ordered by one of Relli's U.S. government customers.

**2.    Relli Asks Safety Socket to Re-Certify the SSLLC Commercial Fasteners to Certify Their Compliance with the Military Specifications Applicable to the Fasteners Ordered by the U.S. Government.**

29.    By e-mail dated April 27, 2018, Relli contacted Safety Socket seeking a modified manufacturer's certification for a quantity of the Altered SSLLC 3/8 Commercial Fasteners.

30.    Fasteners sold for military or aerospace applications are subject to standards and specifications established by or at the direction of an authorized body, such as the Aerospace Industries Association or the U.S. Department of Defense, which approves and maintains the published drawings and written specifications for each fastener.

9

31.     Safety Socket's manufacturer's certification for the subject SSLLC 3/8 Commercial Fasteners qualifies them as standard commercial fasteners only.

32.     In seeking the modified certification, Relli requested that Safety Socket provide an upgraded manufacturer's certification "on company letterhead," to the effect that the Altered SSLLC 3/8 Commercial Fasteners comply with the military standards and specifications applicable to the fasteners ordered by the "U.S. Government," which Relli identified as "the ultimate customer" for the fasteners.

33.     Relli acknowledged that the fasteners it was going to sell were required to conform to "specific quality requirement[s]," consisting of the "applicable specifications SAE J429, ASTM A354, SAE J1199 or ASTM F568m."

34.     None of the foregoing specifications is required for standard commercial fasteners.  Furthermore, the only other instance where Safety Socket has encountered such specifications is in connection with General Dynamics Land Systems Division's ("GDLS") requirements for its military and aerospace fasteners, as depicted on their ordering data.

35.     On or about April 30, 2018, in response to Relli's certification upgrade request, a Safety Socket employee asked, "Are these plated parts and I need to add that specification?"  Relli responded, "Yes, they are plated."

36.     Safety Socket then asked for the plating specification, forcing Relli to admit that, in fact, "[n]o plating from Safety Socket was done" and that the SSLLC 3/8 Commercial Fasteners were "bought plain and we [Relli] had to plate

10

them."

37.    A manufacturer cannot properly certify a part that has been processed by someone else, whose methods and materials are unknown to the manufacturer and are beyond its control.

38.    Under no circumstances could Relli's admitted post-manufacture, unauthorized plating and other processing of the SSLLC Commercial Fasteners legitimately render them compliant with the standards and specifications applicable to the fasteners Relli intended to sell to its U.S. government customer.

39.    The SSLLC 3/8 Commercial Fasteners were not manufactured to military specifications and could not be transformed into the required military-compliant parts by subsequent plating or processing.  This is due, in part, to the need for specific, tightly controlled heat treatments and greater quality control testing of fasteners for the required strength, hardness, ductility, toughness and wear resistance for military compliance.  These are processes which can only be performed during the original fabrication of the fasteners.

40.    Relli's unauthorized alteration of the SSLLC 3/8 Commercial Fasteners nullified their pedigree and identity as Safety Socket fasteners, and voided the representations in Safety Socket's original manufacturer's certification as to, among other things, the fasteners' physical composition.

41.    Safety Socket did not provide the upgraded certification requested by Relli.  Its employee explained to Relli that "SAE J429 and ASTM A354 would have had to be referenced at time of order for proper heat treatment for grade 8, BD, or 10.9."

11

### 3. Relli Appears to Have Adopted Up-certing as an Ongoing Business Practice.

42. Safety Socket believes, but does not at present have actual knowledge, that Relli ultimately delivered the Altered SSLLC 3/8 Commercial Fasteners, as it admittedly intended, to GDLS. Safety Socket's belief is supported by Relli's conduct and admissions as set forth above, including, but not limited to Relli's spending money plating and processing Safety Socket's commercial fasteners. Without a resale to its customers (all of which require military or aerospace-grade fasteners), Relli would be losing the cost of plating as well as the cost of purchasing the commercial fasteners.

43. Relli's intent to continue up-certing as an ongoing business practice is evidenced by several admissions in its April 27, 2018 e-mails. For example, Relli states that "Kanebridge Corporation [is] one of our key suppliers." Relli also admits that it stands ready to purchase more standard commercial fasteners from Kanebridge if necessary to fill its U.S. government order:

> Kanebridge has newer inventory for the same part with attached certs. Same requirements apply. At the end of the day I don't care if I can use my existing inventory or I buy new one from Kanebridge. I hope this doesn't sound confusing but we have two options: either our inventory made in 2010 with previously send [sic] documents or new inventory to buy from Kanebridge with attached certs. At the end of the day both options are good for us.

44. As the foregoing demonstrates, up-certing is the common feature of Relli's "options" for filling orders for military-grade fasteners. If Relli can find a manufacturer willing to provide an upgraded certification, Relli will fill those orders with commercial parts, previously processed by its own plater with no

manufacturer supervision.

45.     As a supplier to the military and aerospace sectors, Relli's ongoing purchases of standard commercial-grade fasteners from Kanebridge can only be explained by Relli's adoption of up-certing as a regular business practice.

### 4. Relli Has Apparently Been Cultivating Up-certing as Its Business Model for Several Years.

46.     Safety Socket is aware of another, earlier transaction in which Relli admittedly sold Safety Socket standard commercial fasteners to GDLS, which manufactures military vehicles such as tanks and lighter armored fighting vehicles.

47.     On or about September 8, 2010, Relli purchased 4,500 Safety Socket standard commercial 5/8-11 x 1-3/4 socket head cap screw (the "SSLLC 5/8 Commercial Fasteners") from Kanebridge (lot I010N-0000).

48.     On or about August 18, 2011, Relli contacted Safety Socket seeking to verify through an independent lab test that one or more of the SSLLC 5/8 Commercial Fasteners it sold to GDLS would not gauge properly, meaning that the fastener's threads did not fit as required with the mating threads.

49.     During the discussion, Relli's employee recalled that Relli had plated the SSLLC 5/8 Commercial Fasteners and sold them to GDLS in fulfillment of GDLS' order for part number 12387270-167. The plating explained the gauging problem, ending Relli's inquiry.

50.     The prefix "12387270" in the above-referenced part number ordered by GDLS signifies the military specifications with which these fasteners must comply. These requirements include compliance with the federal specification

13

FF-S-86 and the fastener heads being permanently marked with the "source accepting responsibility" for the parts.[3]

51.     Although Safety Socket was unable to confirm the actual order and sale to GDLS, Relli's admitted and documented conduct, i.e., purchasing and plating the SSLLC 5/8 Commercial Fasteners for sale as military-compliant parts, is yet another example of Relli's pattern of up-certing.

52.     One of Relli's requests for price quotes from manufacturers (No. 340-3022-82896) for a military part further evidences Relli's adoption of up-certing as a regular business practice.  The quote requested is for an MS16998-28, which is a fastener that is subject to the federal procurement specification FF-S-86E, as amended.  FF-S-86E, as amended, requires in section 3.5.5:

> Screws with nominal size .1900 and larger shall be permanently marked to identify the source accepting responsibility for the screws meeting the requirements specified herein.  The markings shall be a source identifying symbol for a manufacturer in accordance with in [sic] MIL-HDBK-57[.]

53.     However, Relli's request indicates that the company will accept an unfinished, i.e., incomplete and non-conforming product and, based on Relli's known conduct, will then plate the part using its own plater.

**5.     Relli Misappropriates Safety Socket's Trademarks, Goodwill and Reputation for High Standards to Gain Competitive Advantages Over Sellers of Legitimately Certified Military and Aerospace Fasteners.**

54.     Military and aerospace-grade fasteners are significantly more

---

[3] Export control laws preclude the inclusion of this specification in its entirety herein.

expensive than their commercial-grade counterparts. Depending on the quantity involved, the cost could be, at a minimum, twice that of the commercial parts and potentially exponentially greater.

55. This cost disparity results in part from the much smaller production lots, higher costs of the raw materials, fabrication treatments for strengthening and corrosion resistance, and more extensive testing which are necessary for compliance with military and aerospace specifications.

56. The lower cost and ready availability of commercial fasteners afford a military and aerospace supplier, such as Relli, competitive advantages over a manufacturer and seller, such as Safety Socket, whose cost of goods sold are significantly higher – and lead times longer -- due to their compliance with military and aerospace specifications.

57. Additionally, Safety Socket has a reputation in the industry for consistently manufacturing high quality fasteners that meet, and more often exceed, the applicable industry standards and specifications.

58. Upon information and belief, Relli has included Safety Socket's trademarked manufacturer's certification in one or more of its shipments of altered Safety Socket commercial fasteners to fill orders for military-compliant fasteners.

59. Relli unfairly and unlawfully benefits from the association of its goods with Safety Socket, whose reputation and goodwill create an appearance of legitimacy for what are actually altered or otherwise non-compliant fasteners.

**6.    Relli's Up-certing is a Dangerous Practice with the Potential to Cause Serious Harm to Persons and Property.**

60.    Upon information and belief, Relli has repeatedly sold, and continues to sell, up-certed standard commercial fasteners to its customers including, without limitation, the U.S. Armed Forces and various suppliers of the U.S. Department of Defense and other government agencies.

61.    Standard commercial fasteners are not fabricated, processed or tested to withstand the full range of conditions typically encountered by fasteners used in military or aerospace applications.   Up-certed standard commercial fasteners therefore have an increased likelihood of critical failure and can therefore be the cause of personal injuries or deaths, as well as extensive damage or total loss to costly military or aerospace assets.

62.    By its actions as described herein, Relli is knowingly putting military personnel and others at risk of serious harm or death, and creating a substantially increased risk of costly property damage.

**7.    In the Event Relli's Up-certing Causes Injury or Damage, Safety Socket Could be Wrongfully Implicated Therein.**

63.    The extent of the proliferation of the altered Safety Socket standard commercial fasteners is, at this time, unknown.   Unknown end users may be confused as to whether these fasteners are safe for military or aerospace use.

64.    Moreover, in the event that an accident does occur, proper investigation may be hampered by confusion over the actual nature of the altered Safety Socket standard commercial fasteners.   Safety Socket may be wrongly implicated as (a) a participant in Relli's up-certing scheme, (b) the manufacturer

16

of the altered Safety Socket standard commercial fasteners or (c) a responsible party who should be held accountable and liable for any such accident.

65.     In addition to the potentially tragic consequences to third parties, Relli's up-certing may also cause undeserved damage to Safety Socket's reputation as a provider of safe, reliable, high quality fasteners for commercial use and for the aerospace industry.  Accordingly, it is a practice that warrants effective deterrent and punitive measures.

## V.  COUNTS

### FIRST CAUSE OF ACTION
### (Trademark Infringement Under 15 U.S.C. §1125(a))

66.     Plaintiff incorporates by reference the preceding paragraphs 1 through 65 as if fully set forth herein.

67.     Plaintiff's Safety Socket Marks are inherently distinctive, acquiring distinction from other marks through Plaintiff's long, continuous and exclusive use of the Banded Knurl Mark since 1960, the SAFETY SOCKET word mark since 1931, and the SAFETY SOCKET and Design mark since 2004.

68.     Due to the foregoing and Plaintiff's consistently positive publicity and advertising to its consumer community under the Safety Socket Marks, these marks have become uniquely associated with Plaintiff and identify Plaintiff as the source of Plaintiff's product.

69.     Defendant's use in commerce of the Safety Socket Marks without the consent of Plaintiff has been, and will continue to be, likely to cause confusion, mistake or deception among the public and/or Plaintiff's direct or indirect customers as to the affiliation, connection or association of Plaintiff with

17

Defendant.

70.     Defendant's use in commerce of the Safety Socket Marks without the consent of Plaintiff falsely suggests that Defendant's goods and services are connected with, sponsored by, affiliated with and/or related to Plaintiff and its products and services marketed under the Safety Socket Marks.

71.     Defendant's unauthorized use of Plaintiff's Safety Socket Marks in connection with Defendant's goods and services constitutes trademark infringement in violation of 15 U.S.C. §1125(a).

72.     Defendants have acted with knowledge of Plaintiff's Safety Socket Marks and with (a) deliberate indifference to the injury to the public and to Safety Socket that will be caused by its trademark infringement and (b) the intent to unfairly benefit from the goodwill symbolized by the Safety Socket Marks.

73.     As a direct and proximate result of Defendant's actions, Plaintiff has suffered, and is continuing to suffer, irreparable injury to its business reputation and loss of goodwill and has incurred, and is continuing to incur, monetary damages.

74.     Plaintiff is entitled to an accounting for Defendant's profits on infringing goods and is entitled to recover from Defendant all damages sustained by Plaintiff as well as profits realized by Defendant as a result of Defendant's wrongful acts.  Plaintiff is presently unable to ascertain the full extent of monetary damages it has suffered and which it is entitled to collect from Defendant by reason of Defendant's acts of trademark infringement.

75.     Defendant will continue, unless restrained, to use Plaintiff's Safety

Socket Marks, which will cause irreparable harm to Plaintiff. Plaintiff has no adequate remedy at law for Defendant's conduct. Plaintiff is entitled to an injunction restraining Defendant, its officers, agents and employees, and all persons acting in concert with Defendant, from engaging in further acts of trademark infringement.

76.     Plaintiff is entitled to corrective advertising, at Defendant's expense, in an amount and manner to be determined, for the purposes of (a) insuring public safety and freedom from confusion and (b) mitigating the damages to Plaintiff's reputation caused by Defendant.

77.     Due to the willful and exceptionally egregious nature of Defendant's wrongful acts, Plaintiff is entitled to an award of its attorneys' fees and costs associated with this lawsuit as well as treble damages pursuant to 15 U.S.C. § 1117(a).

## SECOND CAUSE OF ACTION
### (Unfair Competition and False Designation of Origin Under 15 U.S.C. §1125(a))

78.     Plaintiff incorporates by reference the preceding paragraphs 1 through 77 as if fully set forth herein.

79.     Plaintiff's Safety Socket Marks are inherently distinctive, acquiring distinction from other marks through Plaintiff's long, continuous and exclusive use of the Banded Knurl Mark since 1960, the SAFETY SOCKET word mark since 1931, and the SAFETY SOCKET and Design mark since 2004.

80.     Due to the foregoing and Plaintiff's consistently positive publicity and advertising to its consumer community under the Safety Socket Marks,

these marks have become uniquely associated with Plaintiff and identify Plaintiff as the source of Plaintiff's product.

81.     Defendant's use in commerce of the Safety Socket Marks without the consent of Plaintiff has been, and will continue to be, likely to cause confusion, mistake or deception among the public and/or Plaintiff's direct or indirect customers as to the origin, sponsorship, or approval by Plaintiff of Defendants' goods, services or commercial activities.

82.     Defendants' unauthorized use of Plaintiff's Safety Socket Marks in connection with Defendant's confusingly similar goods constitutes unfair competition and a false designation of origin in violation of 15 U.S.C. § 1125(a).

83.     Defendants have acted with knowledge of Plaintiff's Safety Socket Marks and with (a) deliberate indifference to the injury to the public and to Safety Socket that will be caused by its trademark infringement and (b) the intent to unfairly benefit from the goodwill symbolized by the Safety Socket Marks.

84.     As a direct and proximate result of Defendant's actions, Plaintiff has suffered, and is continuing to suffer, irreparable injury to its business reputation and loss of goodwill and has incurred, and is continuing to incur, monetary damages.

85.     Plaintiff is entitled to an accounting for Defendant's profits on infringing goods and to recover from Defendant all damages sustained by Plaintiff as well as profits realized by Defendant as a result of Defendant's wrongful acts. Plaintiff is presently unable to ascertain the full extent of monetary damages it has suffered and which it is entitled to collect from Defendant by reason of

20

Defendant's acts of trademark infringement.

86.     Defendant will continue, unless restrained, to use Plaintiff's Safety Socket Marks, which will cause irreparable harm to Plaintiff.  Plaintiff has no adequate remedy at law for Defendant's conduct.  Plaintiff is entitled to an injunction restraining Defendant, its officers, agents and employees, and all persons acting in concert with Defendant, from engaging in further acts of trademark infringement.

87.     Plaintiff is entitled to corrective advertising, at Defendant's expense, in an amount and manner to be determined, for the purposes of (a) insuring public safety and freedom from confusion and (b) mitigating the damages to Plaintiff's reputation caused by Defendant.

88.     Due to the willful and exceptionally egregious nature of Defendant's wrongful acts, Plaintiff is entitled to an award of its attorneys' fees and costs associated with this lawsuit as well as treble damages pursuant to 15 U.S.C. § 1117(a).

## THIRD CAUSE OF ACTION
### (Trademark Infringement Under Illinois Law)

89.     Plaintiff incorporates by reference the preceding paragraphs 1 through 88 as if fully set forth herein.

90.     Plaintiff's Safety Socket Marks are inherently distinctive, acquiring distinction from other marks through Plaintiff's long, continuous and exclusive use of the Banded Knurl Mark since 1960, the SAFETY SOCKET word mark since 1931, and the SAFETY SOCKET and Design mark since 2004.

91.     Due to the foregoing and Plaintiff's consistently positive publicity

and advertising to its consumer community under the Safety Socket Marks, these marks have become uniquely associated with Plaintiff and identify Plaintiff as the source of Plaintiff's product. Plaintiff's Safety Socket Marks are valid trademarks under the common law of Illinois.

92. Defendant's acts constitute trademark infringement under the common law of Illinois.

93. Defendants have acted with knowledge of Plaintiff's Safety Socket Marks and with (a) deliberate indifference to the injury to the public and to Safety Socket that will be caused by its trademark infringement and (b) the intent to unfairly benefit from the goodwill symbolized by the Safety Socket Marks.

94. As a direct and proximate result of Defendant's actions, Plaintiff has suffered, and is continuing to suffer, irreparable injury to its business reputation and loss of goodwill and has incurred, and is continuing to incur, monetary damages.

95. Plaintiff is entitled to an accounting for Defendant's profits on infringing goods and to recover from Defendant all damages sustained by Plaintiff as well as profits realized by Defendant as a result of Defendant's wrongful acts. Plaintiff is presently unable to ascertain the full extent of monetary damages it has suffered and which it is entitled to collect from Defendant by reason of Defendant's acts of trademark infringement.

96. Defendant will continue, unless restrained, to use Plaintiff's Safety Socket Marks, which will cause irreparable harm to Plaintiff. Plaintiff has no adequate remedy at law for Defendant's conduct. Plaintiff is entitled to an

22

injunction restraining Defendant, its officers, agents and employees, and all persons acting in concert with Defendant, from engaging in further acts of trademark infringement.

97. Plaintiff is entitled to corrective advertising, at Defendant's expense, in an amount and manner to be determined, for the purposes of (a) insuring public safety and freedom from confusion and (b) mitigating the damages to Plaintiff's reputation caused by Defendant.

98. Due to the willful and exceptionally egregious nature of Defendant's wrongful acts, Plaintiff is entitled to and seeks hereby, among other damages, an award of punitive damages.

## FOURTH CAUSE OF ACTION
### (Unfair Competition Under Illinois Law)

99. Plaintiff incorporates by reference the preceding paragraphs 1 through 97 as if fully set forth herein.

100. Plaintiff's Safety Socket Marks are inherently distinctive, acquiring distinction from other marks through Plaintiff's long, continuous and exclusive use of the Banded Knurl Mark since 1960, the SAFETY SOCKET word mark since 1931, and the SAFETY SOCKET and Design mark since 2004.

101. Due to the foregoing and Plaintiff's consistently positive publicity and advertising to its consumer community under the Safety Socket Marks, these marks have become uniquely associated with Plaintiff and identify Plaintiff as the source of Plaintiff's product. Plaintiff's Safety Socket Marks are valid trademarks under state and federal law.

102. Defendant's unauthorized and infringing use of the Safety Socket

Marks constitutes unfair competition with Plaintiff under the common law of Illinois, in that such use enables Defendant, unfairly and through deceptive means, to obtain the benefit of, and trade upon, the widespread recognition and goodwill of Plaintiff in, among other places, its industry.

103. Defendants have acted with knowledge of Plaintiff's Safety Socket Marks and with (a) deliberate indifference to the injury to the public and to Safety Socket that will be caused by its trademark infringement and (b) the intent to unfairly benefit from the goodwill symbolized by the Safety Socket Marks.

104. As a direct and proximate result of Defendant's actions, Plaintiff has suffered, and is continuing to suffer, irreparable injury to its business reputation and loss of goodwill and has incurred, and is continuing to incur, monetary damages.

105. Plaintiff is entitled to an accounting for Defendant's profits on infringing goods and to recover from Defendant all damages sustained by Plaintiff as well as profits realized by Defendant as a result of Defendant's wrongful acts. Plaintiff is presently unable to ascertain the full extent of monetary damages it has suffered and which it is entitled to collect from Defendant by reason of Defendant's acts of trademark infringement.

106. Defendant will continue, unless restrained, to use Plaintiff's Safety Socket Marks, which will cause irreparable harm to Plaintiff. Plaintiff has no adequate remedy at law for Defendant's conduct. Plaintiff is entitled to an injunction restraining Defendant, its officers, agents and employees, and all persons acting in concert with Defendant, from engaging in further acts of unfair

competition.

107.   Plaintiff is entitled to corrective advertising, at Defendant's expense, in an amount and manner to be determined, for the purposes of (a) insuring public safety and freedom from confusion and (b) mitigating the damages to Plaintiff's reputation caused by Defendant.

108.   Due to the willful and exceptionally egregious nature of Defendant's wrongful acts, Plaintiff is entitled to and seeks hereby, among other damages, an award of punitive damages.

**FIFTH CAUSE OF ACTION**
**(Deceptive Trade Practices Under 815 ILCS § 510/2, *et seq.*)**

109.   Plaintiff incorporates by reference the preceding Paragraphs 1 – 108 of this Complaint as if fully set forth herein.

110.   Plaintiff's Safety Socket Marks are inherently distinctive, acquiring distinction from other marks through Plaintiff's long, continuous and exclusive use of the Banded Knurl Mark since 1960, the SAFETY SOCKET word mark since 1931, and the SAFETY SOCKET and Design mark since 2004.

111.   Due to the foregoing and Plaintiff's consistently positive publicity and advertising to its consumer community under the Safety Socket Marks, these marks have become uniquely associated with Plaintiff and identify Plaintiff as the source of Plaintiff's product.   Plaintiff's Safety Socket Marks are valid trademarks under state and federal law.

112.   Defendants have engaged in unfair and deceptive acts and practices which have created a likelihood of confusion or misunderstanding as to the source, sponsorship or approval of the goods they are offering for sale.

25

113. Defendant's acts have also created a likelihood of confusion and misunderstanding as to whether Defendant is affiliated, connected or associated with Plaintiff and have created a likelihood of confusion and misunderstanding as to Defendant's goods being affiliated with, connected with and certified by Plaintiff. Defendant's acts are in violation of the Illinois Uniform Deceptive Trade Practices Act.

114. Defendants have acted with knowledge of Plaintiff's Safety Socket Marks and with (a) deliberate indifference to the injury to the public and to Safety Socket that will be caused by its trademark infringement and (b) the intent to unfairly benefit from the goodwill symbolized by the Safety Socket Marks.

115. As a direct and proximate result of Defendant's actions, Plaintiff has suffered, and is continuing to suffer, irreparable injury to its business reputation and loss of goodwill and has incurred, and is continuing to incur, monetary damages.

116. Plaintiff is entitled to an accounting for Defendant's profits on infringing goods and to recover from Defendant all damages sustained by Plaintiff as well as profits realized by Defendant as a result of Defendant's wrongful acts. Plaintiff is presently unable to ascertain the full extent of monetary damages it has suffered and which it is entitled to collect from Defendant by reason of Defendant's acts of trademark infringement.

117. Defendant will continue, unless restrained, to use Plaintiff's Safety Socket Marks, which will cause irreparable harm to Plaintiff. Plaintiff has no adequate remedy at law for Defendant's conduct. Plaintiff is entitled to an

injunction, pursuant to 815 ILCS § 510/3, restraining Defendant, its officers, agents and employees, and all persons acting in concert with Defendant, from engaging in further acts of unfair competition.

118. Plaintiff is entitled to corrective advertising, at Defendant's expense, in an amount and manner to be determined, for the purposes of (a) insuring public safety and freedom from confusion and (b) mitigating the damages to Plaintiff's reputation caused by Defendant.

119. Defendants have intentionally and willfully engaged in the deceptive trade practices described above. Accordingly, pursuant to 815 ILCS § 510/3 Plaintiff is entitled, and seeks hereby, to recover its costs and attorneys' fees incurred in connection with this lawsuit.

## VI. **JURY DEMAND**

120. Plaintiff requests a jury trial on all causes of action herein so triable.

## VII. **PRAYER FOR RELIEF**

**WHEREFORE**, for the foregoing reasons, Plaintiff respectfully prays for relief as follows:

1. Entry of an order and judgment requiring that Defendant and its officers, agents, servants, employees, owners and representatives, and all other persons, firms or corporations in active concert or participation with them, be permanently enjoined and restrained from (a) using the Safety Socket Marks, or any colorable imitation of those marks, in connection with any goods manufactured by Safety Socket that have been plated, treated or in any way altered through any process not requested or ordered, expressly and in writing,

27

by Safety Socket; (b) using the Safety Socket Marks, or any colorable imitation of those marks, in connection with any goods manufactured by Safety Socket that have not been properly, genuinely and lawfully certified by all necessary persons or entities, including but not limited to, Safety Socket, as meeting all specifications and criteria of any kind required under any applicable federal, state, agency, industry or departmental law, regulation, code or guideline, governing, relating or referring to such goods and the implementation thereof; (c) using the Safety Socket Marks, or any colorable imitation of those marks, in connection with any goods not manufactured by Safety Socket; (d) whether or not in connection with the Safety Socket Marks, acquiring, distributing, selling or dealing in any way with goods manufactured by Safety Socket that have been plated, treated or in any way altered through any process not requested or ordered, expressly and in writing, by Safety Socket; (e) whether or not in connection with the Safety Socket Marks, acquiring, distributing, selling or dealing in any way with goods manufactured by Safety Socket that have not been properly, genuinely and lawfully certified by all necessary persons or entities, including but not limited to, Safety Socket, as meeting all specifications and criteria of any kind required under all applicable federal, state, agency, industry or departmental laws, regulations, codes or guidelines, governing, relating or referring to such goods and the implementation thereof; (f) doing any act or thing calculated or likely to cause confusion or mistake in the minds of members of the public, or current or prospective, direct or indirect, customers of Plaintiff's products, with respect to the source of any products offered for sale, sold or

distributed by Defendant, or with respect to Plaintiff's certification, authorization, sponsorship or approval of products offered for sale, sold or distributed by Defendant; or (g) engaging in any acts constituting trademark infringement, unfair competition or false designation of origin under federal or state law, or constituting a deceptive trade practice under Illinois law;

2. Entry of an order and judgment requiring Defendant, pursuant to 15 U.S.C. §1118, to deliver to Plaintiff at Defendant's expense, (a) all infringing goods, including, without limitation, the altered SSLLC 3/8 Commercial Fasteners, the altered SSLLC 5/8 Commercial Fasteners, as well as any certifications or copies thereof, relating or purportedly relating to the aforementioned fasteners, (b) Defendant's entire inventory of fasteners with Safety Socket's Banded Knurl Mark, (c) all purchase orders, bills of sale, invoices, packing slips or other documents reflecting the purchase, sale, plating or other processing, or orders for the fasteners described in (a) and (b), above, (d) a list of all sales made by Defendant of the altered SSLLC 3/8 Commercial Fasteners, the altered SSLLC 5/8 Commercial Fasteners and any other Safety Socket commercial fasteners sold to fulfill orders for military or aerospace compliant parts, including the quantity, part number, date of sale and name of purchaser and (e) all promotional or sales materials, invoices, certifications, bills of lading or other documents bearing the Safety Socket Marks, used by Defendant in connection with the unlawful conduct described in this Complaint;

3. Entry of an order and judgment requiring Defendant, pursuant to 15 U.S.C. § 1116(a), to file with this Court and serve upon Plaintiff within thirty

(30) days after entry of the injunction, a report in writing under oath setting forth in detail the manner and form in which Defendants have complied with the injunction and implemented adequate and effective means to discontinue the practices enjoined pursuant to Paragraph 1, hereinabove;

4.      Entry of an order and judgment requiring Defendant, pursuant to 15 U.S.C. §1117, to account for and pay to Plaintiff damages arising from Defendant's violation of the Lanham Act;

5.      Entry of an order and judgment requiring Defendant, pursuant to 15 U.S.C. §1117, to account for and disgorge to Plaintiff all of the profits realized by Defendant or others in active concert or participation with Defendant, relating to the use of the Safety Socket Marks;

6.      Entry of an order and judgment requiring Defendant, pursuant to 15 U.S.C. §1117, to pay to Plaintiff all further damages as deemed appropriate, under the circumstances, including, but not limited to, Plaintiff's costs and reasonable attorneys' fees in connection with this action;

7.      Entry of an order and judgment requiring Defendant, pursuant to 815 ILCS §510/3, granting Plaintiff injunctive relief as requested herein and as the Court may otherwise deem appropriate, and allowing Plaintiff to recover its costs and attorneys' fees incurred in connection with this action;

8.      Entry of an order and judgment requiring Defendant, pursuant to 815 ILCS §510/3 and as otherwise allowed under law, to pay punitive damages to Plaintiff in an amount to be determined;

9.      Entry of an order and judgment requiring Defendant to pay

prejudgment interest; and

      10.    Entry of an order and judgment granting Plaintiff such other and further relief as the Court deems just and proper.

Dated:     October 1, 2018     SAFETY SOCKET LLC,
                                     by its attorney:

                                     /s/ Steven M. Shebar

Steven M. Shebar
N.D. Ill. Bar No. 6297608
SHEBAR LAW FIRM
0N370 Fanchon Street
Wheaton, Illinois 60187
(630) 877-6833
steveshebar@shebarlaw.com

*Attorneys for Plaintiff Safety Socket LLC*