IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SAFETY SOCKET LLC, a Delaware limited liability company, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 18-cv-06670 |
| v. | ) ) ) | Hon. Jeremy C. Daniel |
| RELLI TECHNOLOGY, INC., a New York corporation, | ) ) ) | Hon. Heather K. McShain Magistrate Judge |
| Defendant. | ) ) | |

**RELLI TECHNOLOGY'S**
**MOTION FOR JUDGMENT UNDER THE DOCTRINE OF LACHES**

    The record in this case is undisputed and clear: Plaintiff Safety Socket learned about Relli's accused infringement in 2011. It did not send a cease-and-desist letter to Relli. It did not tell Relli to stop. It did not ask Relli any questions about why it plated a Safety Socket part. It did not ask Relli why it tried to sell a piece sold under a commercial part number to satisfy an order for a military part number. Instead, it did ***nothing*** and sat on its hands, allowing Relli to work and distinguish itself in the marketplace based on its ability to engage in the very conduct at the heart of this lawsuit.

    Seven years later, Safety Socket learned of another potentially infringing sale by Relli but again took no action to alert Relli to its concerns. Instead, it waited an additional six months to file this lawsuit.

    As demonstrated below, Safety Socket's delay was unreasonable, it inflicted unfair prejudice onto Relli, and warrants entry of judgment in Relli's favor.

*Background*

In August 2011, Relli contacted Safety Socket and informed it that a Safety Socket part Relli was trying to sell to GDLS did not gauge properly. (*See* Ex. A, 6/18/24 Laches Hearing Rough Transcript ("Laches Tr.") at 50-51.) The parts at issue were socket head cap screws, marked with the Double Banded Knurl mark, bearing a commercial part number, which Relli purchased from Safety Socket's distributor (Kanebridge Corporation), had plated by a third-party vendor, and sold to a customer to fulfill an order designated with a military part number. (*Id.* at 52-55.) This is what Safety Socket has referred to in this case as "up-certing," and Safety Socket's owner admitted it had all the information it needed back in 2011 to know that Relli engaged in the practice. (*Id.* at 55.) Despite this knowledge, Safety Socket did nothing to address or rectify the issue with Relli. (*Id.*)

Safety Socket's former Vice President of sales, Steve Payne, described another incident in which he learned that Relli had engaged in similar conduct with another customer. Mr. Payne received a call from a representative of BAE Systems, a defense contractor that does business with Relli. (*See* Ex. B, 6/5/24 Rough Trial Transcript ("Day 3 Tr.") at 93.) As with the instance involving GDLS, BAE experienced issues with gauging on a screw that bore Safety Socket's knurl headmark. BAE called to ask about how Safety Socket plated the part. BAE provided Mr. Payne the lot number for the screw, and he was able to determine that Safety Socket had not plated the part. (*Id.*) BAE informed Mr. Payne that it had obtained the screw from Relli. (*Id.* at 94.) Although Mr. Payne knew that Relli sold the part to BAE, that Safety Socket had not plated the part, and that it would have been able to use the part's lot number to determine whether it was a "commercial" screw, he nevertheless took no further action. (*Id.*) He did not contact Relli, ask

2

them any questions, or make any effort to learn anything further about the issue. In fact, Mr. Payne considered the issue to be a dispute between BAE and its supplier, Relli, and let it be. (*Id.*)

Relli contacted Safety Socket again in April 2018 asking it to issue a certification stating that the Safety Socket parts that Relli had plated met requirements issued by GDLS. (Laches Tr. at 61.) Safety Socket declined to issue a new certification. Otherwise, as with the prior two instances, Safety Socket did nothing to address the issue with Relli. (*Id.*)

Instead of asking Relli to stop plating Safety Socket parts, alerting Relli to Safety Socket's concern regarding up-certing or infringement, or otherwise informing Relli that Safety Socket thought Relli's conduct was improper, Safety Socket prepared a complaint and filed suit six months later, in October 2018. (*Id.* at 62-63.)

In the intervening years between Relli's 2011 phone call to Safety Socket and its 2018 correspondence with Safety Socket, Relli developed a reputation among its customers a as reliable and efficient source of these make-to-print parts, which its customers frequently needed on a short timeframe and in small quantities. (Laches Tr. at 10-11; Day 3 Tr. at 184; Ex. C, 6/6/24 Rough Trial Transcript ("Day 4 Tr.") at 46-49.) This was unusual in the industry, where typically customers would be required to purchase large quantities of fasteners and wait a long time for the turnaround. (Day 4 Tr. at 46-49.)

Safety Socket's inaction and lack of diligence has placed Relli in a very difficult position with customers whom it had spent seven-years prior to litigation building a strong relationship, one that is now tenuously uncertain. (Laches Tr. at 14-15.) These harms would have been avoided if during that 2011 phone call, or anytime thereafter, Safety Socket had bothered to tell Relli that it objected to its practices.

3

*Argument*

The Court should grant judgment in Relli's favor on its defense of laches. The doctrine of laches "is derived from the maxim that those who sleep on their rights, lose them." *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 801, 821 (7th Cir. 1999). Laches arises from "(1) an unreasonable lack of diligence by the party against whom the defense is asserted and (2) prejudice arising therefrom." *Id.* Both of these factors are present here.

I.  **Safety Socket Unreasonably Delayed Filing Suit.**

   A.  **The Court Should Presume Unreasonable Delay.**

In trademark litigation claims, there is a presumption that laches applies if the plaintiff fails to bring suit within three years after discovering the purported infringement. *See Ill. Tamale Co. v. El-Greg, Inc.*, 2018 U.S. Dist. LEXIS 210928, at *4 (N.D. Ill. Dec. 14, 2018) ("Thus, because [plaintiff] did not file suit within three years after learning of the claimed infringement, a presumption of unreasonable delay applies.").

Safety Socket admitted that it knew Relli was engaging in the allegedly infringing conduct at least by August 2011, *seven* years before it filed suit. *See Ameripay LLC v. Ameripay Payroll, Ld.*, 2005 U.S. Dist. LEXIS 20453, at *10-11 (N.D. Ill. Sept. 16, 2005) ("The Court holds that plaintiff's nearly five-year delay in filing suit creates a presumption of laches."); *Chattanoga Mfg., Inc. v. Nike, Inc.*, 301 F.3d 789, 793 (7th Cir. 2002) (presumption of laches after nine-year delay); *Smith v. Caterpillar, Inc.*, 338 F.3d 730, 734 (7th Cir. 2003) (summary judgment on laches based on eight-year delay).

Having established the presumption of unreasonable delay based on Safety Socket's seven-year deferral, Safety Socket must rebut the presumption with "specific evidence excusing the delay." *Ameripay*, 2005 U.S. Dist. LEXIS 20453, at *9 (citing *AC Aukerman Co. v. Miller*

*Formless Co., Inc.*, 693 F.2d 697, 699 (7th Cir. 1982)). Safety Socket bears the burden of explaining its delay. *Id.* at *9-10 (citing *Miller v. City of Indianapolis*, 281 F.3d 648, 653 (7th Cir. 2002)). As explained below, Safety Socket is unable to meet this burden.

### B. The Court Should Find Unreasonable Delay, Even If Not Presumed.

"The law is well settled that where the question of laches is in issue the plaintiff is chargeable with such knowledge as he may have obtained upon inquiry, provided the facts already known by him were such as to put upon a man of ordinary intelligence the duty of inquiry." *Chattanoga*, 301 F.3d at 793.

Here, Safety Socket admitted that it had all the information it needed back in 2011 to know that Relli was engaging in up-certing. (Laches Tr. at 55.) It knew that Relli purchased parts carrying commercial part numbers from Kanebridge. (*Id.* at 51-53.) It knew that Relli sent those parts to be plated by a third-party vendor. (*Id.*) It knew that Relli then tried to sell those parts to GDLS to fill an order for parts with military part numbers. (*Id.*) And it knew that GDLS rejected the parts because they would not gauge properly. (*Id.*)

Moreover, Payne testified to learning about a second comparable incident involving Relli's customer BAE. Although he was not specific about the time frame of that incident, Mr. Payne acknowledged that he knew Relli sold BAE a part that had been plated after it left Safety Socket's control. Mr. Payne also had information – the lot number – that would have allowed him to determine if the screw was a commercial or military grade fastener. But, just as with the 2011 GDLS incident, Safety Socket took no action.

But that is not all Safety Socket knew. In 2009, Safety Socket learned that E&A Products used an outside vendor to plate Safety Socket's socket had cap screws and sold them to BAE as military fasteners, and that those parts had failed. (*Id.* at 48-50; Ex. D, 6/4/2024 Rough Trial

5

Transcript ("Day 2 Tr.") at 139.) As a result, Safety Socket participated in a meeting with the Navy and BAE's suppliers to address the issue. (Laches Tr. at 49.) Thus, back in 2009, this was an issue that Safety Socket was highly concerned about. Yet, when Relli informed Safety Socket that it was engaging in similar practices, Safety Socket failed to act.

Safety Socket asserts that its seven-year delay was reasonable because (i) it did not have documentation regarding Relli's 2011 transaction, and (ii) it did not know the scope of Relli's up-certing. Neither of these excuses render Safety Socket's delay reasonable.

With respect to documentation, Safety Socket had every ability to request documents or more information from Relli during or after the 2011 phone call. The facts known to Safety Socket at the time – that Relli purchased a commercial part, had it plated, tried to sell it under a military part number, and the part failed to gauge properly – "were such as to put upon a man of ordinary intelligence the duty of inquiry." *Chattanoga*, 301 F.3d at 793. This is especially true where, as here, Safety Socket was already highly concerned about these types of practices based on the E&A Products failure. And it is not as if Relli was trying to hide this practice. Quite the opposite, as **Relli called Safety Socket** to consult about the gauging issue. Safety Socket is thus "chargeable with such knowledge as he may have obtained upon inquiry[.]" *Id.* Safety Socket could have, and should have, sought further information from Relli, and the Court should charge Safety Socket with knowledge of those additional facts.

The same is true with respect to the scope of Relli's conduct. Under *Chattanoga*, Safety Socket had knowledge of facts such that it had a duty to inquire further into Relli's conduct at the time, and Safety Socket should be charged with the knowledge it would have gained had it made those reasonable inquiries. And it had another opportunity to investigate the matter when Mr.

6

Payne learned about the plated screws sold to BAE. But again, Safety Socket chose to stick its head in the sand and sit on its rights.

To the extent Safety Socket attempts to excuse its inaction on the grounds that it did not realize that Relli's conduct might constitute trademark infringement, that effort should fail. Of course, a party is presumed to know the law, and Safety Socket had all the information and resources it needed to explore any potential claim back when it first learned of Relli's actions. And the record reveals that Safety Socket had trademark counsel in 2011; it had worked with counsel from Barnes & Thornburg in 2008 and 2010 to submit trademark applications, and it engaged Ms. Shebar in 2014 to submit another trademark application. (Laches Tr. at 63-64.) Safety Socket could have, and should have, consulted with counsel and made reasonable inquiries into Relli's conduct. Indeed, any suggestion that Safety Socket's procrastination should be excused because it may not have realized that a particular legal theory could apply is essentially requiring Relli to be more diligent about Safety Socket's rights than Safety Socket.

This excuse is even more implausible given the fact that Safety Socket filed suit against Accurate Aerospace fifteen days after it learned of a ***single instance*** of up-certing. At the time Safety Socket sued Accurate Aerospace, Safety Socket knew of one transaction in which Accurate Aerospace purchased commercial-grade socket head cap screws marked with the Double Banded Knurl from Kanebridge, had them plated by a third-party vendor, and sold those screws to its customer to satisfy an order for military-grade parts. (Laches Tr. at 57-59.) These are the ***very same facts*** Safety Socket knew about Relli in 2011. Safety Socket learned about Accurate Aerospace's conduct on or around March 3, 2015, and filed suit on March 20, 2015. (*Id.* at 59-60.) At the time it filed suit against Accurate Aerospace, Safety Socket did not know the full scope of Accurate Aerospace's conduct; it did not know if this was the one and only time Accurate

7

Aerospace engaged in up-certing. (*Id.* at 60.) It sued anyway, and immediately. Whereas, in 2018, when it learned about a third instance of Relli's purported infringement Safety Socket took another six months to take any action.

Moreover, Safety Socket did not truly learn more about the "scope" of Relli's purported up-certing in 2018; it only learned about one other instance. Safety Socket's argument that this 2018 occurrence was necessary to justify litigation misses the point; Safety Socket could have tried to resolve this dispute with Relli outside of court in 2011 (or after it learned of the BAE sale, or again in 2018), but it never so much as asked Relli to stop up-certing. *See Hot Wax*, 191 F.3d 813, 823 (7th Cir. 1999) (suggesting that a "serious attempt" to resolve a dispute outside of court would have made a delay in filing reasonable).

At bottom, in 2011 Safety Socket was highly concerned about up-certing and knew everything it needed to know to conclude Relli was engaging in up-certing. It thus had a duty to inquire further into Relli's practices in 2011, and the Court should charge it with any knowledge it would have gained through that reasonable inquiry. Relli was also openly discussing the situation with Safety Socket, having called Safety Socket to consult about the gauging issue, and so there is no reason to believe Relli would have been anything but forthcoming in answering any inquiry from Safety Socket. Under these circumstances, Safety Socket's complete and utter silence is patently unreasonable.

## II. Safety Socket's Delay Prejudiced Relli.

"[L]aches lies on a sliding scale: the longer the plaintiff delays in filing her claim, the less prejudice the defendant must show in order to defend on laches." *Caterpillar*, 338 F.3d at 734. Safety Socket's seven-year delay is substantial enough to require minimal evidence of prejudice. *See id.* at 734 ("Here, given [plaintiff's] inexcusable eight and one-half year delay, we recognize

8

that [defendant] need not present a mountain of evidence establishing prejudice in order to succeed on its laches defense.").

"Prejudice may be shown if the plaintiff's unexcused failure to exercise its rights caused the defendant to rely to its detriment and build up a valuable business around its trademark." *Chattanoga*, 301 F.3d at 795. Here, Relli built a relationship with several key customers around its ability to supply these make-to-print parts timely and in small quantities; its ability to do so ingratiated it with those customers and supported its ability to be competitive with other distributors. (Laches Tr. at 12; Day 3 Tr. at 184; Day 4 Tr. at 46-49.) Those relationships are now in jeopardy. Relli must now navigate the legality of how it supplied these parts to customers for over a decade and must cease offering the service that provided it an advantage with its customers. And had Safety Socket notified Relli back in 2011 that it believed Relli's conduct to be up-certing (or infringement, or fraud, or otherwise illegal or improper), Relli could have addressed it then, before this practice became so ingrained into its service relationship with its customers.

Moreover, Relli *knew* Safety Socket was aware of its conduct; after-all, Relli called Safety Socket and told them about it. It thus had absolutely no reason to think that Safety Socket had any objection to Relli's conduct. And so it continued to engage in those practices and represent to its customers that it could continue to do so.

The filing delay also caused Relli to continue to accrue costs in support of its supply of make-to-print parts that it would not have invested in otherwise. (Laches Tr. at 6-9.) As a preliminary matter, Relli did effectively stop selling Safety Socket parts once it received notice of the lawsuit. Safety Socket points to sales identified in Relli's Trial Exhibit 1 as evidence that Relli continued to infringe after Safety Socket filed its lawsuit, but there is more to it than that. Relli's Exhibit 1 shows two instances in which Relli supplied fasteners post-litigation. Kanebridge Order

9

No. 10 shows that Relli sold $585.00 worth of fasteners out of its stock to BAE on January 25, 2021. (*See* Ex. E, Relli Tr. Ex. 1.) The customer in that instance ordered a ***commercial part number***, not a military part number. (Laches Tr. at 37.) But Safety Socket's complaint alleged that Relli infringed on Safety Sockets marks when it represented commercial parts as military-grade parts. (*See* Dkt. 1 ¶¶ 18-53 (defining "Defendant's Unlawful Uses of Plaintiff's Goods and Trademarks" as up-certing commercial parts as military parts).) Thus, in January 2021 it was reasonable for Relli to believe it could supply these parts without issue because they did not fall under the liability theory that Safety Socket had asserted.

With respect to the post-filing sales reflected in Kanebridge Order No. 13, those sales were invoiced on October 24 and 29, 2018. (Relli Tr. Ex. 1.) Although the complaint was filed on October 2, 2018, Safety Socket did not complete service of process on Relli until October 15, 2018 (*See* Ex. F, Proof of Service), and Relli did not engage counsel to appear on its behalf until October 30, 2018 (Dkt. 12). These sales thus occurred before Relli could reasonably seek legal guidance as to how to proceed in the face of service of process.

Under these circumstances, it is reasonable to infer that Relli would have likewise stopped selling Safety Socket's cap screws in 2011 if Safety Socket had made Relli aware at that time of its objection to Relli's conduct. On this front, *Ill. Tamale Co. v. El-Greg, Inc.* is instructive:

> [Defendant] El-Greg's first point—that it was deprived of the opportunity to cut off damages at an earlier date—and its third point—that [plaintiff] Illinois Tamale's delay allowed damages to pile up in a prejudicial way—are actually two sides of the same coin. The argument has merit. First, it is supported factually. El-Greg changed its label after the suit was filed, not immediately, but soon enough to reasonably infer that there was a cause-and-effect relationship. There is every reason to believe that El-Greg would have acted similarly had it been sued in 2011, or 2012, or any earlier time. Second, El-Greg's argument is supported legally. *See Hot Wax, Inc.*, 191 F.3d at 824 (had plaintiff pressed its claims in a timely manner, defendant "certainly could have . . . simply renamed its products"). For these reasons, the Court concludes that El-Greg has established its defense of laches.

2018 U.S. Dist. LEXIS 210928, at *7 (N.D. Ill. Dec. 14, 2018). The Court should likewise conclude that Relli has established laches here.

### III. The Jury's Willfulness Finding Does Not Bar Laches.

Any argument that the jury's finding of willfulness bars application of laches is easily dismissed. The jury instructions required the jury to find willfulness if Relli "knew that it was infringing Plaintiff's trademark ***or if it acted with indifference*** to Plaintiff's trademark rights." (Dkt. 270 at 32 (emphasis added).) Indifference, however, is insufficient to bar laches. *See Hot Wax*, 191 F.3d at 826 (only "willful, egregious, or unconscionable conduct" could be a bar to laches). There is no record evidence confirming a finding of willful, egregious, or unconscionable conduct, and the jury was not asked to find willfulness as opposed to indifference. Under such circumstances, like in *Ill. Tamale Co.*, the jury's verdict cannot be claimed to bar application of this defense:

> Here, the jury's findings of willfulness were not necessarily premised on findings of intentional infringement, because the jury was instructed that El-Greg could act willfully if it "acted with indifference" to Illinois Tamale's rights.

*Ill. Tamale Co. v. El-Greg, Inc.*, 2019 U.S. Dist. LEXIS 156329, at *61 (N.D. Ill. Sept. 13, 2019); *see also Kars 4 Kids Inc. v Am. Can!*, 98 F.4th 436, 450 (3d Dist. 2024) ("Willfulness—as defined for the jury and not further clarified by the District Court—is insufficient to support a finding of unclean hands.").

As a result, the jury's verdict does not bar Relli's laches defense.

### *Conclusion*

For the foregoing reasons, the Court should enter judgment in Relli's favor and dismiss the complaint with prejudice.

Dated: August 2, 2024            Respectfully submitted,

/s/ *James P. Fieweger*

11

        James P. Fieweger
        Carolyn E. Isaac
        MICHAEL BEST & FRIEDRICH LLP
        444 West Lake Street, Suite 3200
        Chicago, Illinois 60606
        T: 312.222.0800; F: 312.222.0818
        jpfieweger@michaelbest.com
        ceisaac@michaelbest.com

        *Attorneys for Defendant Relli Technology, Inc.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 2nd day of August 2024, a copy of the foregoing document was served on the following counsel as indicated below.

| Steven M. Shebar<br>SHEBAR LAW FIRM<br>0N370 Fanchon St.<br>Wheaton, Illinois 60187 | ☒ Via CM/ECF Service<br>☐ Via First Class Mail<br>☐ Via E-mail:<br>    steveshbar@shebarlaw.com |
|---|---|

 

*/s/ James P. Fieweger*
James P. Fieweger